UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

BANNER LIFE INSURANCE CO.,

                                        Plaintiff,

        v.                                              Action No. 3:11-CV-434

JACQUELINE L. NOEL,

                                        Defendant.

**MEMORANDUM OPINION**

THIS MATTER is before the Court on cross motions for summary judgment. For the

reasons that follow, the Court will GRANT Banner Life Insurance Company's Motion (Doc.

No. 20) and DENY Jacqueline L. Noel's Motion. (Doc. No. 16.)

I.      **BACKGROUND**

        *A.  Case Posture*

In this declaratory judgment action, Plaintiff Banner Life Insurance Company

("Banner") seeks a declaration that its liability is limited to a refund of the premium

submitted because Gary C. Noel ("Noel") made multiple material misrepresentations in his

application for life insurance. Banner asks the Court to grant summary judgment in its

favor, arguing it has met its burden under Virginia Code section 38.2-309 of clearly proving

that Noel made knowingly false representations that were material to Banner's risk and

decision whether to postpone or decline issuance of the life insurance policy applied for.

Banner also requests that Defendant's estoppel counterclaim be dismissed with prejudice.

Defendant Jacqueline L. Noel ("Ms. Noel"), the beneficiary designated in Noel's life

insurance application, asks that the Court grant summary judgment in her favor, arguing

1

she is entitled to $1,000,000 in temporary life insurance coverage because (1) the

Temporary Life Insurance Application and Agreement ("TIAA") is a separate and distinct

contract that contains no misrepresentations and (2) none of the misrepresentations

alleged by Banner are material.

### B.  Facts

The following facts are undisputed. On November 30, 2010, Noel met with insurance

agent Christopher Roberts to obtain life insurance through Banner. During the course of his

meeting with Roberts, Noel completed and signed a Banner Life Insurance Application for a

30-year level term life insurance policy providing $1,000,000 in coverage. In addition to

other paperwork related to the application, Noel completed three forms: Part 1, Part 2 –

Medical History, and the TIAA. Roberts asked Noel each question as it appeared on Part 1

and Part 2, recording Noel's verbal answers. Noel signed Part 1 and Part 2 after all of his

answers were recorded. In executing the application, Noel signed the following statement:

> I/we have read the application and all statements and answers contained in
> Part 1 and Part 2 of this application and any supplements thereto, copies of
> which shall be attached to and made a part of any policy to be issued, are true
> and complete to the best of my/our knowledge and belief and made to induce
> Banner Life Insurance Company (the Company) to issue an insurance policy.
> The statements and answers in the application are the basis for any policy
> issued by the Company, and no information about me will be considered to
> have been given to the Company unless it is stated in the application. I agree
> to notify the Company of any changes to the statements and answers given in
> any part of the application before accepting delivery of any policy.
>
> No agent or other person has power to: (a) accept risk; (b) make or modify
> contracts; (c) make, void, waive or change any conditions or provisions of the
> application, policy or receipt, as applicable; (d) waive any Company rights or
> requirements; (e) waive any information the Company requests; (f)
> discharge any contract of insurance; or (g) bind the Company by making
> promises respecting benefits upon any policy to be issued.

(Banner Ex. A, at 5.)

In the course of completing Part 2, Noel answered the following questions pertinent to this action: (1) whether he had ever been consulted by a member of the medical profession or been diagnosed or treated for (among other things) sleep apnea; (2) whether within the last five years he had been (a) treated by a member of the medical profession, (b) had a diagnostic test, (c) been advised by a member of the medical profession to have medical treatment or diagnostic testing yet to be completed, or (d) been referred to any other member of the medical profession or medical facility; and (3) whether in the last five years he had been diagnosed, treated, tested positive for, or was given any medical advice for any disease or disorder not previously stated on the application. (*See* Banner Ex. A, at 7–9.) If any of these questions was answered "Yes," the instructions directed Noel to provide details, including provider, date, symptoms, diagnosis, and treatment. (Banner Ex. A, at 7.)

Noel answered "No" to all of these questions except one; in answer to the question whether he had any diagnostic tests within the last five years, Noel answered "Yes" and indicated that his primary care physician had regular tests run each year to ensure he was healthy.

After completing Part 1, Part 2 – Medical History, and signing the above statement, Roberts gave Noel the option of submitting the TIAA. Roberts told Noel that it was ultimately up to Banner as to whether any life insurance coverage was issued. Noel did not ask Roberts any questions about the TIAA. After some further explanation regarding the TIAA from Roberts, Noel completed and executed the TIAA, which provided for a modal premium payment of $913.90 based on a Standard Plus Premium class rating quoted by Roberts. The TIAA included a separate "TEMPORARY INSURANCE APPLICATION" section

consisting of four "Yes" or "No" questions and a "TEMPORARY INSURANCE AGREEMENT."

The TIAA's agreement section included the following provisions:

> THIS AGREEMENT PROVIDES A LIMITED AMOUNT OF LIFE INSURANCE COVERAGE FOR A LIMITED AMOUNT OF TIME, SUBJECT TO THE TERMS AND CONDITIONS SET FORTH BELOW.
>
> **TEMPORARY INSURANCE AGREEMENT**
>
> **Agreement.** Subject to the terms of the policy applied for and this TIAA, the Insurer agrees to pay the Limited Amount to the beneficiaries listed in the Application – Part 1 upon receipt of due proof that the Proposed Insured died, except due to suicide, and provided all eligibility requirements and conditions for coverage under this Agreement have been met. The consideration for temporary insurance is the Temporary Insurance Application and payment of an amount equal to the first modal premium for the plan applied for or completion of the payment options form.
> . . .
> **Other Limitations.** The Insurer's liability will be limited to a return of the Amount Remitted if: (1) any part of the life insurance application or this TIAA contains a misrepresentation material to the Insurer; or (2) the Proposed Insured dies by suicide.

(Banner Ex. A, at 10.) In signing the TIAA, Noel certified that he understood and agreed to

the following:

> I represent that: (1) I have read and received a copy of this TIAA and agree to all of its terms and conditions; (2) I understand and agree that temporary insurance will not begin if any question in this TIAA is answered Yes or left blank and any collection of premium will not activate coverage under this agreement; (3) the answers given in this TIAA are true and correct, and I understand that, if they are false, temporary insurance may be denied or declined; (4) I understand that completing this TIAA does not guarantee that the Insurer will issue a policy on the Proposed Insured's life; (5) I understand that the licensed insurance agent is not authorized to change or waive the terms of this TIAA or to collect premium if the Proposed Insured is ineligible for coverage under this Agreement; and (6) I understand that any premium submitted with this TIAA will be refunded if the Insurer does not approve the requested coverage.

(Banner Ex. A, at 11 (boldface throughout original omitted).) After Noel completed the

TIAA, Ms. Noel gave Roberts a check made out to Banner in the amount of $913.90, the

amount of the modal premium payment. Roberts relied on "everything" in the section "Part 2 – Medical History" in having Noel submit the TIAA.* If Noel had disclosed something seriously wrong with his health, Roberts would not have offered Noel the option of completing a TIAA, and would not have allowed Noel to submit a TIAA along with its associated initial premium payment.

After he submitted his application, Noel was required to undergo an abbreviated "paramed" that included measurements of height, weight, pulse, and blood. Noel's paramed was completed on December 9, 2010. At the time of the paramed, Noel also gave blood and urine samples for testing. Banner received the lab results from Noel's paramed, which indicated among other things elevated liver function, on December 14, 2010. (Lucas Aff. ¶ 13.)

Banner's underwriting consultant Sean Lucas ("Lucas") reviewed Noel's application. Upon learning of Noel's disclosed history of hypertension in the application, Lucas ordered Noel's medical records from his primary care physician, Dr. Robert Quarles. Banner received the records on January 1, 2011, and Lucas reviewed them on January 6. (Lucas Aff. ¶¶ 16–17.) These medical records disclosed, among other things, that: (1) Noel had a long history of elevated liver function tests; (2) Noel had an abdominal ultrasound in February 2009 that showed increased echogenicity in the liver suggesting steatosis (infiltration of fat) or fibrosis (thickening or scarring from previous inflammation or injury); and (3) Dr. Quarles had referred Noel to gastroenterologist Dr. Rufus Davis on multiple occasions, and on one occasion ordered Noel to follow up with Davis due to continued elevations in his liver function tests. Banner's laboratory test results from Noel's abbreviated paramed

---

* The parties dispute whether Banner required Noel to complete Part 2. Ms. Noel cannot dispute, however, that Noel did complete Part 2.

showed Noel's alanine aminotransferase (ALT) level was elevated to 61 and his gamma-glutamyl transferase (GGT) level was elevated to 104, putting Noel outside of the Standard Plus Premium class rating quoted by agent Roberts. Upon reviewing Noel's records on January 6, Lucas requested Noel's medical records from the gastroenterologist, Dr. Davis. Lucas did so in order to see the results of Dr. Davis's final "work-up" and diagnosis regarding Noel's elevated liver function tests and abnormal abdominal sonogram.

On January 19, 2011, Banner received Noel's medical records from Dr. Davis. The medical information submitted did not reference any office visits to Davis relative to Dr. Quarles's referrals, so on January 25, 2011, Lucas requested that agent Roberts confirm with Noel whether he had actually seen the gastroenterologist. Roberts indicated in a January 31, 2011 email to Banner that Noel had not been to the gastroenterologist since February of 2008 despite Quarles's multiple referrals.

Banner's underwriting process was complete by February 3, 2011. Based on his discovery of the February 2009 abdominal ultrasound and its results, Noel's history of elevated liver function test results, the abbreviated paramed laboratory test results, and the fact that Noel had failed to visit the gastroenterologist, Lucas suggested on February 3 that Banner postpone issuance of the policy to Noel pending definitive diagnosis for the cause of his elevated liver function tests and confirmation if he had liver steatosis or fibrosis. On February 4, 2011, this suggestion was reviewed in accordance with Banner company policy by its medical director, Dr. Steven Wabnitz. Wabnitz agreed with Lucas's recommendation. Wabnitz's agreement had the effect of making official Banner's decision to postpone issuance of the policy.

Before Banner reported its Friday, February 4, 2011 decision to postpone issuance of the policy to Noel and refund the premium submitted, Banner was notified that Noel had died sometime between Sunday, February 6 and Monday, February 7, 2011. Ms. Noel submitted a claim for coverage, and Noel's file was thereafter handled by Banner's claim department.

Banner's claim department notified Ms. Noel that CS Claim Group, Inc. would be conducting an investigation, and would contact her for an interview and to get authorizations to obtain Noel's medical records. Banner's receipt of Noel's medical records confirmed the medical history outlined above.

After Banner received Noel's health insurance and medical information, Banner's chief underwriter Sharon Jenkins reviewed Noel's file and rendered the following opinion:

> Nr. Noel's failure to disclose his abnormal liver function tests, his abdominal ultrasound and results, his health care provider's recommendation for further work-up by a gastroenterologist, his visit to the Sleep Disorder Center in 2007 for symptoms of obstructive sleep apnea or the recommendation for additional testing including a sleep study were material in that banner would not have issued a policy to Mr. Noel as applied for.

(Banner Ex. N.) Banner then held a claim review meeting, and a committee unanimously agreed that Ms. Noel's claim should be denied. By letter to Ms. Noel's counsel dated July 5, 2011, Banner denied Noel's claim for temporary life insurance benefits under the TIAA due to Noel's multiple material misrepresentations. Enclosed with the letter was a check representing a refund of the premium submitted with the TIAA with interest. Banner filed this declaratory judgment action the very next day, on July 6, 2011.

## II.    LEGAL STANDARD

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing the nonexistence of a triable issue of fact by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (internal quotation marks omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Therefore, if the nonmoving party's evidence is only colorable or is not significantly probative, summary judgment may be granted.  *Id.* at 249–50.

In considering whether summary judgment is proper, the Court must look to whether a rational trier of fact, viewing the record in its totality, could find for the nonmoving party. *See Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir. 1992) (citing *Anderson*, 477 U.S. at 248–49).  All "factual disputes and any competing, rational inferences [are resolved] in the light most favorable to the party opposing [the] motion."  *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted).

When considering cross motions for summary judgment, the Court must apply the same standard outlined above, and cannot resolve genuine issues of material fact. *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999). The Court should "consider and rule upon each party's motion separately and

determine whether summary judgment is appropriate as to each under the Rule 56 standard." *Id.*

### III.  DISCUSSION

"Under Virginia law, an applicant for insurance must answer an application truthfully and fully to give the insurer the opportunity to make its own inquiry and determine whether to undertake the risk." *Carolina Cas. Ins. Co. v. Draper & Goldberg, P.L.L.C.*, 138 F. App'x 542, 547 (4th Cir. 2005) (citing *Mutual of Omaha Ins. Co. v. Echols*, 207 Va. 949, 953–54, 154 S.E.2d 169, 172 (1967)); *see also Inter-Ocean Ins. Co. v. Harkrader*, 193 Va. 96, 101, 67 S.E.2d 894, 897 (1951) ("A misstatement of material facts by the applicant takes away [the insurer's] opportunity to estimate the risk under its contract.").

An insurer seeking to rescind a contract based on an alleged misrepresentation must establish two elements by clear proof: (1) the falsity of the insured's representation; and (2) that the false representation was material to the insurer's determination to undertake the risk and issue the policy. Va. Code § 38.2-309 ("No statement in an application or in any affidavit made before or after loss under the policy shall bar a recovery upon a policy of insurance unless it is clearly proved that such answer or statement was material to the risk when assumed and was untrue."); *Commercial Underwriters Ins. Co. v. Hunt & Calderone, P.C.*, 261 Va. 38, 42, 540 S.E.2d 491, 493 (2001).

Banner alleges that Noel made misrepresentations in the Part 2 – Medical History section of the application that were material to Banner's determination to undertake the risk. Nowhere does Ms. Noel appear to dispute that false representations were made in Part 2. Instead, her summary judgment motion relies on her arguments that (1) Part 2 is

not referenced in the TIAA, and (2) that any misrepresentations made in Part 2 were not relied upon by Banner in its decision to bind coverage and were therefore not material.

Ms. Noel argues that the TIAA is a separate and distinct contract for life insurance that contains no misrepresentations, much less material misrepresentations. By its own name and its structure, the TIAA is both an application and an agreement: the Temporary Insurance Application and Agreement is divided into sections containing the labels "TEMPORARY INSURANCE APPLICATION" and "TEMPORARY INSURANCE AGREEMENT." The application section—which according to Ms. Noel essentially serves the underwriting function of Banner's temporary insurance product—consists of four "Yes" or "No" questions that protect against unacceptable risk by providing that coverage cannot begin if any of the questions are answered "Yes." The agreement section recites that "[t]he consideration for temporary insurance is the Temporary Insurance Application and payment." (Banner Ex. A, at 10.) Ms. Noel contends that the TIAA is designed to provide Banner Life with immediate payment of a premium and "lock-in" the customer at the application phase by discouraging the customer to change her mind upon approval of a policy. As Noel answered "No" to all four questions and provided payment, Noel fulfilled all of his contractual obligations, and now Banner must do the same.

While never expressly disputing that the TIAA is a separate and distinct contract, Banner emphasizes that the TIAA is part of a multi-page application packet that includes: instructions, notice to proposed insured, Part 1, Part 2 – Medical History, TIAA, agent's report, electronic funds transfer payment options form, release of health related information form, and privacy policy. Banner insists that the TIAA is not a contract for

temporary life insurance coverage that exists in a vacuum separate and apart from the Banner Life Insurance Application of which it is a part.

Banner argues that the TIAA is subject to its own terms and conditions, namely its provision that Banner's liability "will be limited to a return of the Amount Remitted if . . . any part of the life insurance application or this TIAA contains a misrepresentation material to [Banner]." (Banner Ex. A, at 10.) In signing the TIAA, Noel represented that he had read it and agreed to its terms; understood that completing the TIAA did not guarantee that Banner would ultimately issue the life insurance policy; and understood that if Banner did not approve the requested coverage, the premium submitted with the TIAA would be refunded. In Virginia, it is well-settled that "one who signs an application for life insurance without reading the application or having someone read it to him is chargeable with notice of the application's contents and bound thereby." *Gen. Ins. of Roanoke, Inc. v. Page*, 250 Va. 409, 412, 464 S.E.2d 343, 344 (1995). In light of this rule and the language of the TIAA, Banner asserts that any material misrepresentation in any part of the life insurance application or the TIAA may form a proper basis for rescission.

### A.  The Meaning of the Terms of the TIAA

Central to the resolution of these summary judgment motions is the dispute between the parties as to whether Banner can rely on any misrepresentations made by Noel in a section of Banner's application packet labeled "Part 2 – Medical History." Two issues are bound up in this dispute: whether the "material misrepresentations" provision of the TIAA refers only to misrepresentations made in the TIAA, and if not, whether it refers to misrepresentations made in Part 2.

11

Contract term interpretation is a matter of law that must be decided by the Court. "The construction of insurance contracts [is] governed by the same general rules as are applied to the construction of other written contracts." *Quesenberry v. Nichols*, 208 Va. 667, 672, 159 S.E.2d 636, 640 (1968). The Supreme Court of Virginia recently said:

> An insurance policy is a contract, and, as in the case of any other contract, the words used are given their ordinary and customary meaning when they are susceptible of such construction. Additionally, in the absence of an ambiguity . . . we must interpret the contract by examining the language explicitly contained therein. [W]here an agreement is complete on its face, [and] is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.

*Sch. Bd. of the City of Newport News v. Commonwealth*, 279 Va. 460, 468, 689 S.E.2d 731, 735 (2010) (quoting *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 240 Va. 457, 459, 397 S.E.2d 876, 877 (1990)).

Banner contends that it can rely on any misrepresentations made by Noel in Part 2 of the application packet based on the provision in the TIAA limiting Banner's liability "to a return of the Amount Remitted if . . . any part of the life insurance application or this TIAA contains a misrepresentation material to [Banner]." (Banner Ex. A, at 10.) As this material misrepresentations provision limiting Banner's liability is phrased in the disjunctive, Banner argues it can rely on any material misrepresentations in either the TIAA *or* any part of the life insurance application. The section of the application packet labeled "Part 2 – Medical History" is a part of the "life insurance application" contemplated by the material misrepresentations provision, as the unambiguous language of the application specifically refers to the application consisting of Part 1 and 2 and any supplement thereto.

Ms. Noel contends that Banner cannot rely on any misrepresentations made by Noel in the "Part 2 – Medical History" section. According to Ms. Noel, the term "life insurance

application" in the material misrepresentations provision can only mean the life insurance application section of the TIAA itself. The term "life insurance application" is never defined in the TIAA; moreover, the section "Part 2 – Medical History" never mentions, nor is titled, "the life insurance application." Rather, it is titled "Medical History." If the Court determines that the term "life insurance application" does not refer to the life insurance application of the TIAA itself, the term is ambiguous, and must be construed "strictly against the insurer and liberally in favor of the insured, so as to effect the dominant purpose of . . . payment to the insured." *Great Am. Ins. Co. v. Gross*, 2008 WL 376263, at *6 (E.D. Va. Feb. 11, 2008) (quoting *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004)).

Banner has the better part of this argument. Construing the term "life insurance application" in the phrase "any part of the life insurance application or this TIAA" to refer only to the application section of the TIAA would render the term "life insurance application" wholly redundant, as the TIAA, by its name and structure, is both an application and an agreement. Ms. Noel in fact argues the latter point stridently, but at the same time seeks to avoid the logical conclusion that "life insurance application" must refer to something *beyond* the TIAA, unless it is mere surplusage. To make the point expressly, adopting Ms. Noel's construction of the terms "TIAA" and "life insurance application" would result in the material misrepresentations provision reading, in pertinent part: "any part of the life insurance application section of the TIAA or this TIAA." Given the presence of the disjunctive "or" in the phrase, this construction simply does not make sense. *Cf. Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (explaining that canons of statutory construction

13

"ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise").

The far more sensible construction that the Court adopts is that the term "life insurance application" refers to the application packet as a whole, including the sections labeled "Part 1," "Part 2 – Medical History," and the TIAA.

The term "life insurance application" is not ambiguous. While the term "application" does not appear to be expressly defined anywhere in the application packet, each component of the application packet tendered to the Court references the "application" generally. Page four of Part 1 states, "Submit this page with the rest of the application even if no information [is] entered." (Banner Ex. A, at 4.) Page five, lying between Part 1, ending on page four, and "Part 2 – Medical History," beginning on page seven, refers to "THIS APPLICATION FOR INSURANCE," and asks the proposed insured to declare "I/we have read the application and all statements and answers contained in Part 1 and Part 2 of this application." (Banner Ex. A, at 5.) Questions 23 and 29 in the portion of the application packet at issue—"Part 2 – Medical History"—ask the proposed insured to answer "Yes" and explain answers to certain questions unless the appropriate answer is "No," or unless the information is "previously stated on this application." (Banner Ex. A, at 8–9.) Finally, page 12, consisting of the "AGENT'S REPORT" and "STATEMENTS BY AGENT," asks generally, "Was the application signed after all questions were answered?" and references "the application" or "this application" multiple times in connection with the agent's required certification.

In light of all of these general references to the "application" throughout the consecutively numbered pages of the application packet, and page five's unambiguous

14

language referring to "Part 1 and Part 2 of this application," it is clear that the term "life insurance application" in the TIAA's provision "any part of the life insurance application or this TIAA" references the application packet generally, including "Part 2 – Medical History." Accordingly, Banner can rely on Noel's responses in Part 2 in order to prove Noel made knowing misrepresentations material to Banner's risk. *See Page*, 250 Va. at 412, 464 S.E.2d at 344–45.

**B.   Whether Banner Has Established by Clear Proof that Noel's Answers in Part 2 Were (1) Knowingly False and (2) Material to Banner's Risk**

**1.   Knowing Falsity**

Whether a misrepresentation was made, and the terms on which it was made, is ordinarily a question of fact decided by the jury. *Harrell v. N.C. Mut. Life Ins. Co.*, 215 Va. 829, 831–32, 213 S.E.2d 792, 794 (1975). If the jury "could reasonably resolve the issue in favor of the insured, summary judgment for the insurer is precluded." *Huberts v. Traveler's Indem. Co.*, 113 F.3d 1232 (4th Cir. 1997) (unpublished table decision). "Nonetheless, if the record clearly shows that the insured gave statements that were not true and correct to the best of the insured's knowledge and belief, where asked to do so, then the Court may resolve the question as a matter of law." *Gross*, 2008 WL 376263, at *5 (citing *Parkerson v. Fed. Home Life Ins. Co.*, 797 F. Supp. 1308, 1315 (E.D. Va. 1992)).

In the ordinary case, the insurer must prove the falsity of the statement by clear proof. But where, as here, the proposed insured certifies his answers are "correct to the best of his knowledge . . .  the burden upon the insurance carrier increases to clear proof that the answer is knowingly false." *Old Republic Life Ins. Co. v. Bales*, 213 Va. 771, 773, 195 S.E.2d 854, 856 (1973). This standard of proof is a heightened one, but is not as exacting as the clear and convincing standard required in certain fraud cases. *Id.*

The evidence shows that Banner has met its burden of clearly proving that Noel

made knowingly false statements in Part 2 of the application. As noted above, Ms. Noel does

not appear to dispute this point, and her concession on this issue is understandable, as the

evidence reveals that Noel failed to truthfully and completely answer six questions:

Questions 18, 23(a), 23(b), 23(d), 23(e), and 29. All of these questions were located in a

section of Part 2 that instructed the following: "MEDICAL HISTORY – Provide details to Yes

answers in the Remarks section. Include provider, date, symptoms, diagnosis, and

treatment." (Banner Ex. A, at 7.)

Question 18 asked Noel whether he had

ever consulted a member of the medical profession regarding or . . . been
diagnosed or treated for:

18. Asthma, shortness of breath, chronic cough or hoarseness, bronchitis,
    emphysema, COPD (chronic obstructive pulmonary disease), sarcoidosis,
    pneumonia, TB (tuberculosis), *sleep apnea*, or any other disorder of the
    respiratory system?

(Banner Ex. A, at 8 (emphasis added).)

Question 23 provided, in pertinent part:

23. In the last five years, unless previously stated on this application, have
    you:
    a. Been treated by a member of the medical profession or at a medical
    facility?
    b. Had an electrocardiogram, x-ray, blood test, or other diagnostic test,
    excluding an HIV test?
    . . .
    d. Been advised by a member of the medical profession to have surgery,
    medical treatment, biopsy, or diagnostic testing, excluding HIV testing,
    that has not yet been completed?
    e. Been referred to any other member of the medical profession or
    medical facility?
    . . . .

(Banner Ex. A, at 8.)

Finally, Question 29 asked the following: "In the past 5 years, have you been diagnosed, treated, tested positive for, or been given medical advice by a member of the medical profession for any disease or disorder not previously stated on this application?" (Banner Ex. A, at 9.)

Noel answered "No" to all of these questions except for Question 23(b). Noel's response of "No" to Question 18 was not true and complete in that Noel failed to disclose that he had consulted his primary care physician, Dr. Quarles, and the Sleep Disorders Center of Virginia, for sleep apnea. Noel's response of "No" to Question 23(a) was not true and complete as Noel failed to disclose that he had been treated for several years by Dr. Quarles for his elevated liver function test results. Noel's "No" response to Question 23(d) was not true and complete as he failed to disclose that he has been advised by both Dr. Quarles and the doctors at the Sleep Disorders Center of Virginia to have a diagnostic sleep study. Noel's "No" response to Question 23(e) was similarly deficient as Noel failed to disclose that Dr. Quarles had referred him on multiple occasions to gastroenterologist Dr. Rufus Davis (or another gastroenterologist) for follow-up on and final diagnosis of Noel's history of elevated liver function tests and abnormal abdominal sonogram results. Finally, Noel's answer of "No" to Question 29 was not true and complete as Noel again failed here to disclose his history of elevated liver function tests.

In answer to Question 23(b), Noel responded "Yes" and provided the following explanation: "DR. QUARLES 1504 SANTA ROSA RD #103 HENRICO, VA. 23229[—]ANNUAL PHYSICAL EVERY YEAR[—]HAS REGULAR TEST RUN TO MAKE SURE HE IS HEALTHY. GOOD HEALTH[.]" (Banner Ex. A, at 8.) This answer was not true and complete as Noel failed to disclose: (1) that for several years he had regular diagnostic liver function tests for

17

his history of elevated liver enzymes; and (2) that he had an abdominal sonogram that showed increased echogenicity of the liver suggesting steatosis or fibrosis.

In its denial letter to Ms. Noel, conceded by her to be an accurate summation of Noel's medical history, Banner summarized its findings:

> In summary, Mr. Noel did not truthfully disclose his abnormal liver function tests, his abdominal ultrasound in 2009 or Dr. Quarles'[s] recommendation for further work-up by Dr. Davis, the gastroenterologist. In addition, Mr. Noel did not disclose his visit to the Sleep Disorder Center in 2007 for suggested obstructive sleep apnea, or the recommendation for additional testing including a sleep study.

(Banner Ex. H, at 5.)

Based on all of this evidence, there can be no question that Banner has met its burden of proving Noel knowingly made false misrepresentations on his application for insurance.

## 2.    Materiality

The materiality of a misrepresentation is question of law for the court. *Harrell*, 215 Va. at 832, 213 S.E.2d at 794. "A fact is material to the risk to be assumed by an insurance company if the fact would reasonably influence the company's decision whether or not to issue a policy." *Echols*, 207 Va. at 953–54, 154 S.E.2d at 172. A fact is also material to the risk if the insurer would have issued the policy on different terms, *see Minn. Lawyers Mut. Ins. Co. v. Hancock*, 600 F. Supp. 2d 702, 709 (E.D. Va. 2009), postponed issuance of the policy, *see Parkerson*, 797 F. Supp. at 1312, 1314–15, or declined to issue the policy at all. *E.g.*, *Hancock*, 600 F. Supp. 2d at 709.

Banner maintains that Noel's multiple misrepresentations were material to Banner's risk in that Banner decided to postpone issuance of any policy to Noel pending additional work-up and definitive diagnosis of his elevated liver function tests. Noel's

18

misrepresentations were also material, Banner argues, in that Banner's underwriters decided during the claims process that Banner ultimately would not have issued the policy as applied for based on Noel's failure to disclose his long history of abnormal liver function tests, his inconclusive ultrasound results, his doctor's repeated recommendations for further work-up by a gastroenterologist, his 2007 consultation for symptoms of obstructive sleep apnea at the Sleep Disorders Center, and multiple doctor recommendations to undergo a diagnostic sleep study test.

Ms. Noel argues that Noel's statements in Part 2 were not material because they did not influence Banner's decision to bind the temporary coverage provided by the TIAA, a separate and distinct contract. Ms. Noel emphasizes that two medical questions on the application portion of the TIAA are repetitious of questions in Part 2 (though admittedly are more targeted). Why are those questions necessary, Ms. Noel asks, if the TIAA isn't a separate contract for insurance? Page five of the application packet also provides that "*except as provided in the [TIAA]*, if any, insurance will not begin unless all persons proposed for insurance are living and insurable as set forth in the application." (Banner Ex. A, at 5 (emphasis added).) This language, Ms. Noel states, makes clear Banner's intent to provide temporary insurance coverage even if it subsequently determined through its underwriting process that Noel was uninsurable. Banner treated the TIAA, a separately signed document, as a separate contract upon its receipt of the entire application package. Indeed, according to Ms. Noel the undisputed facts show Banner bound coverage before the underwriter working on the file even saw Part 2: Fourteen days after the TIAA was executed and the check was delivered to the agent, a notation appeared in the Banner system that read "Application of check changed TIAA bound N to Y." The underwriter didn't

even see the file until four days later. Moreover, the underwriter stated he was only "vaguely" familiar with TIAAs. (Lucas Dep. 10.)

Ms. Noel analogizes this case to *Gross*, *supra*. The policyholders in that case argued Great American bound coverage through its agent before it ever received the policyholders' application to increase the policy limits. 2008 WL 376263, at *10. As Great American had already bound coverage, the policyholders argued that no representations in the application could have been material to Great American's decision to bind. *Id.* Ultimately the district court held that the legal issue of materiality depended on underlying questions of fact that had not been resolved. *Id.* Ms. Noel states that this case is like *Gross*, except no issues of fact remain: Even if every answer in Part 2 was completely false, Banner bound coverage with no reliance on Part 2. This fact is underscored by the deposition testimony of the underwriter, who is on record as stating he is only vaguely familiar with TIAAs. The Supreme Court of Virginia has held that testimony of such a company representative is often determinative on the issue of materiality. *See Echols*, 207 Va. at 954, 154 S.E.2d at 172–73. Accordingly, Ms. Noel argues that the Court should decide the materiality issue in her favor.

Banner responds that Ms. Noel's assertion regarding Banner "binding" coverage is unsupported in law or fact. According to Banner, coverage is never "bound" under a TIAA as Ms. Noel suggests; the TIAA itself never speaks of its temporary life insurance coverage being bound, but instead provides for temporary life insurance coverage from the application date forward provided that Banner ultimately issues the policy. Conversely, the TIAA provides that if Banner never issues the policy, the premium submitted is to be refunded. Defendant's insistence that the file notation "Application of check changed TIAA

20

bound N to Y" equates to Banner "binding" coverage is likewise incorrect, as it does not mean Banner was making a legal determination to bind temporary coverage under the TIAA at that time. The notation was merely an internal, system-generated note that acknowledged to the file Banner's receipt of proper payment from Noel. *Gross*, Banner says, is distinguishable on its facts: crucial to the *Gross* court's decision on materiality was the fact that an insurer sent an email to the insured "to confirm that [it] ha[d] bound coverage" prior to the insurer's receipt of the application. 2008 WL 376263, at *10. This case differs from *Gross*, states Banner, in that Banner never sent any type of formal communication to anyone. The note "Application of check changed TIAA bound N to Y" was internal to Banner and was never seen by Noel, the agent, Roberts, or Ms. Noel.

Banner has met its burden of proving materiality under the law. Ultimately, Ms. Noel's materiality argument is predicated on the idea that Banner "bound" coverage on the TIAA and did not rely on any information outside of the TIAA in making that determination. To support this position, Ms. Noel primarily concentrates on two things: (1) that the TIAA is a *separate* contract; and (2) that the underwriter did not rely on the provisions of that separate contract, as he wasn't familiar with the TIAA and never even looked at Noel's file until after a computer system notation showed Banner considered itself "bound." The initial problem with Ms. Noel's argument is that the computer system notation is insufficient evidence that Banner considered itself "bound" under the TIAA; indeed, in contrast with the insured in *Gross*, Ms. Noel is unable to point to any direct communications between the insurer or his agent and Noel prior to the loss. *See Gross*, 2008 WL 376263, at *10. The notation is simply not enough to create a triable issue of fact that the Court must resolve in order to reach its legal determination on materiality.

Moreover, that the TIAA is a separate contract does not change the fact that its material misrepresentation provision unambiguously entitles Banner to limit its liability if *any* part of the life insurance application contains a misrepresentation material to Banner. Ms. Noel simply cannot escape this language, and ample evidence confirms that once Banner gained knowledge of the facts Noel omitted in Part 2 of the application, it conducted appropriate follow-up, decided to postpone issuance of the policy, and never would have issued the policy as applied for. The thorough investigation of Lucas, Banner's underwriter, revealed that Noel failed to disclose significant medical history related to the health of his liver, his doctor's repeated insistence that he consult further with a gastroenterologist, a consultation for obstructive sleep apnea, and recommendations for diagnostic sleep testing. Only upon completing this investigation was Lucas was in a position to recommend postponing issuance of the policy pending definitive diagnosis. Upon being referred the file from Lucas in accordance with company policy, Dr. Wabnitz, Banner's medical director, concurred with this recommendation. Banner's chief underwriter Sharon Jenkins also opined that Noel's failures to disclose "were material in that Banner would not have issued a policy to Mr. Noel as applied for." (Banner Ex. N.)

In sum, the evidence shows that Banner's diligent investigation uncovered facts not disclosed by Noel that warranted postponement of issuance of the policy, and that any policy ultimately issued would have been on different terms. Noel's misrepresentations were therefore material to Banner's risk. *See Hancock*, 600 F. Supp. 2d at 709 (different terms); *Parkerson*, 797 F. Supp. at 1312, 1314–15 (postponement).

### C.  Ms. Noel's Estoppel Claim

Ms. Noel asserts the following counterclaim against Banner: "[P]laintiff is estopped to deny coverage through its actions of failing to terminate the temporary insurance coverage after discovering the elevated liver function laboratory results on Mr. Noel." (Counterclaim, Doc. No. 6, ¶ 19.) Relying on Virginia's equitable "unclean hands" doctrine as applied in *Pennsylvania Casualty Co. v. Simopoulos*, 235 Va. 460, 369 S.E.2d 166 (1988), Banner argues this estoppel claim should be dismissed.

In *Simopoulos*, the Supreme Court of Virginia held that an applicant for medical malpractice insurance who put a "fraudulent scheme into motion" by supplying false answers on his application for insurance "had no standing in equity to interpose a plea of estoppel." *Id.* at 465, 369 S.E.2d at 169. The Court reasoned that "[e]stoppel is an equitable doctrine, and one cannot 'base a claim for an estoppel upon . . . acts . . . which were induced by his own acts, and *a fortiori* on those induced by his own fraud or false representations.'" *Id.* (quoting *Luck Const. Co. v. Russell Co.*, 115 Va. 335, 342, 79 S.E. 393, 395 (1913)). Any other litigants who assert estoppel claims against an insurer on the same insurance policy stand in the same shoes as the applicant who made a false representation. *See id.*

Banner argues that Ms. Noel stands in the same shoes as Noel, and cannot assert an estoppel claim, as Noel's false and incomplete answers to multiple medical questions on the life insurance application set this entire process in motion.

Ms. Noel responds by stating there is a subtle but important distinction between *Simopoulos* and this case: In *Simopoulos*, the loss occurred *before* the misrepresentations were discovered. In this case, the loss occurred *after* the misrepresentations were discovered. And "[w]hen a party intends to repudiate a contract on the ground of fraud, he

should do so as soon as he discovers the fraud. . . . Prompt action is essential when one believes himself entitled to rescission of a contract." *Finch v. Garrett*, 109 Va. 114, 63 S.E. 417 (1909) (citations omitted). According to Ms. Noel, Banner should have moved to rescind the contract promptly upon the underwriter's review of Noel's medical records during the first week of January 2011, when the underwriter learned of Noel's elevated liver function test results and the referrals to gastroenterologist Dr. Rufus Davis. Instead, Banner did nothing until after Noel died, a month after the underwriter was on notice of Noel's misrepresentations.

Despite Ms. Noel's assertions to the contrary, *Simopoulos* covers the facts of this case. Immediately prior to its explanation and application of the unclean hands defense, the *Simopoulos* court said that in order for an insured party to prevail on an estoppel claim, that party must prove the insurer had "knowledge, actual or imputed, of facts which would render its coverage void *ab initio*, yet issued the policies in question notwithstanding such knowledge." 235 Va. at 465, 369 S.E.2d at 169.

While not expressly articulated in *Simopoulos* or the cases cited therein, the *Simopoulos* court's recitation of the above rule immediately before its application of the unclean hands defense to the facts of the case reveals two important ideas. First, it can be seen as reflecting the principle that the doctrine of unclean hands is not absolute in its application. On this point, the Supreme Court of Virginia has said that the equitable defense of unclean hands should not be applied where the result would be inequitable or violate public policy. *Cline v. Berg*, 273 Va. 142, 148, 639 S.E.2d 231, 234 (2007). Second, it points to the practical reality that, where an insured party is able to prove, by clear and convincing elements, the elements of estoppel, the unclean hands defense may very well not be

24

available to the insurer. Therefore, in insurance disputes similar to this one, an insurer might not be able to avail itself of the equitable defense of unclean hands where it discovers facts that would entitle it to rescind an insurance contract, but nevertheless "treats the contract as a subsisting obligation and leads the other party to believe that the contract is still in effect." *Emp'rs Commercial Union Ins. Co. of Am. v. Great Am. Ins. Co.*, 214 Va. 410, 414–15, 200 S.E.2d 560, 564 (1973) (quoting *Dobie v. Sears, Roebuck, & Co.*, 164 Va. 464, 470, 180 S.E. 289, 291 (1935)). Thus, while the parties' arguments and the cases supporting those arguments might at first blush appear contradictory, they in fact are not. They merely embody the broader maxim that application of the unclean hands doctrine "turns upon the facts of each particular case." *Cline*, 273 Va. at 148, 639 S.E.2d at 234.

Lucas's sworn testimony indicates he was not in a position to recommend that Banner *postpone*, much less *issue*, Noel's policy so early as the first week of January 2011. Instead, the record indicates that Lucas was simply conducting diligent follow-up with respect to Noel's elevated liver function test results and referrals to the gastroenterologist, Dr. Davis, through the month of January. Banner's underwriting process was not complete until February 3, 2011, and Banner ultimately made the decision to postpone issuance of the policy the next day, on February 4, 2011. Therefore, applying the rule articulated in *Simopoulos* to this case, Ms. Noel cannot prove the elements of estoppel: she cannot show that Banner issued Noel a policy despite having actual or constructive knowledge of facts which would have rendered coverage void *ab initio*; instead, she can only show that Banner made the decision to postpone issuance of the policy after a thorough investigation—which was prompted by its discovery of facts withheld by Noel.

This is enough to end the matter, but it is worth noting that the unclean hands defense would be appropriately applied here as well. Ms. Noel, who stands in the shoes of her husband, comes to the Court asking for equitable relief with unclean hands, as Noel failed to disclose (among other things) elevated liver function laboratory results. Having discovered this issue, Banner investigated further as part of its underwriting process. Under these circumstances, it would not be inequitable to grant Banner resort to the unclean hands defense; on the contrary, it would be inequitable to deny it. As the Third Circuit has said, "An insurance company must have the ability to investigate and deliberate before making the difficult decision to rescind an insurance policy. . . . Needless to say, it is not a decision that should be made with any degree of haste." *Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 103 (3d Cir. 1996).

In view of the above, Ms. Noel's estoppel counterclaim must be dismissed.

### IV.      CONCLUSION

For the reasons stated above, the Court GRANTS Banner's Motion, DENIES Ms. Noel's Motion, and DISMISSES Ms. Noel's estoppel counterclaim WITH PREJUDICE.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
United States District Judge

ENTERED this __15th___ day of February 2012

26